**INFORMATICS CORPORATION,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–16C.

United States Court of Federal Claims.

March 18, 1998.*

---

* This opinion was issued under seal on March 10, 1998. Pursuant to ¶ 4 of the opinion, the parties were allowed five business days within which to identify protected/privileged material subject to deletion. Although defendant filed an identification, the material it seeks to delete does not come within the terms of the protective order entered on February 9, 1998.

Reginald T. Blades, Jr., Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Major Rebecca E. Pearson, United States Air Force, of counsel.

## *OPINION*

MILLER, Judge.

This post-award bid protest case is before the court on the administrative record, as supplemented, after argument on cross-motions for summary judgment. The issue to be decided is whether the contracting officer's finding that plaintiff's proposal presented an organizational conflict of interest that could not be avoided or mitigated was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## FACTS

### 1. *The solicitation*

On or about June 19, 1997, the Human Systems Center for Environmental Contracting Division ("HSC/PKV") at Brooks Air Force Base issued a draft request for proposal No. F41624–97–R–8001 (the "RFP" or "solicitation") for "Systems Engineering and Technical Assistance ("SETA"), Assistance and Advisory Services" to support the Air Force Center for Environmental Excellence ("AFCEE").[1] The subsequent modified RFP was issued on July 30, 1997, and, notably, contemplated award to two qualified contractors. The contract had a ceiling not to exceed $46.1 million.

The SETA solicitation's Statement of Work (the "SOW") called for the contractor to support AFCEE's environmental programs such as Base Realignment and Closure, Environmental Planning, Environmental Quality (including pollution prevention and compliance), infrastructure and weapons systems, Environmental Impact Analysis Process, and Military Family Housing Initiatives. Although the SETA solicitation en-

Kenneth B. Weckstein, Washington, DC, for plaintiff.

---

1. Although both parties refer to the client agency as AFCEE, defendant points out that HSC/PKV issued the RFP and that the contracting officer is identified with HSC/PKV. Both AFCEE and HSC/PKV are used interchangeably in this opinion.

compassed a multitude of diverse tasks,[2] individual Task Orders would be employed, so the exact nature and location [3] of the work to be performed would be somewhat speculative until the Task Orders actually were issued.

The SETA RFP included several organizational conflict of interest ("OCI") clauses,[4] which incorporate AFMC FAR Supp. Clause 5352.209–9002 (July 1997), and which provide, in pertinent part:

(a)(2) Restrictions:

(i).... [T]he Contractor's judgment and recommendations must be objective, impartial, and independent. To avoid the prospect of the Contractor's judgment or recommendations being influenced by its own products or capabilities, it is agreed that the Contractor is precluded for the life of the system [5] from award of a DoD contract to supply the system or any of its major components, and from acting as a subcontractor or consultant to a DoD supplier for the system or any of its major components.

ALTERNATE I (Jul.1997) (a)(2)(ii) The contractor shall prepare and submit complete specifications for nondevelopmental items to be used in a competitive acquisition. The contractor shall not furnish these items to the DoD, either as a prime or subcontractor for the duration of the contract plus one year.

. . . .

ALTERNATE IV (Jul.1997) (e) The Contractor agrees to accept and to complete all issued Task Orders, and not to contract with Government prime Contractors or first-tier subcontractors in such a way as to create an organizational conflict of interest.

ALTERNATE VI (Jul.1997) (f) The above restrictions shall be included in all subcontracts, teaming arrangements, and other agreements calling for performance of work which is subject to the organizational conflict of interest restrictions identified in this clause, unless excused in writing by the Contracting Officer.

Section L–2 of the solicitation also included a clause entitled "Potential Organizational Conflict of Interest," which provides:

(a) There is a potential organizational conflict of interest (see FAR Subpart 9.5, Organizational and Consultant Conflicts of Interest) due to the nature of the Statement of Work Requirements. Accordingly:

(1) Restrictions are needed to avoid the prospect of the contractor's judgment or recommendations being influenced by its own products or capabilities. Theses restrictions shall be in effect for the life of the contract plus 1 year.

---

2. According to the "Scope" provision, these tasks included, *inter alia*, performing cost, risk and feasibility studies and analyses; performing groundwater flow modeling; preparing technical reports or specialized graphics; assisting in and presenting technology demonstrations; assisting in drafting regulations, procedures, manuals, systems specifications and standards, training documentation and statements of work; and performing tasks that require knowledge of federal, state, and local statutes and regulations, as well as Air Force and Department of Defense environmental regulations. The "Requirements" provision, almost eight pages long, elaborates on the types of duties that Task Orders will entail, under the broad headings of technical interchange, status and review meetings, staff meetings, and program support.

3. Paragraph 1.2 of the Statement of Work, however, does specify that the contractor shall "establish suitable office facilities" for key contractor personnel, within a 20–mile radius of Brooks Air Force Base, Texas. Also required is "on-site"

support, in accordance with the Statement of Work, at "several world wide locations," including, but not limited to, five specified Air Force bases in California, and one Air Force base each in Wyoming, Alaska, and Hawaii.

4. The Federal Acquisition Regulation ("FAR") defines organizational conflict of interest ("OCI"), as "mean[ing] that because of other activities or relations with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." FAR § 9.501, 48 C.F.R. § 9.501 (1997).

5. The Air Force interpreted the word "system" to mean "the totality of SETA contract projects and tasks in support of AFCEE's environmental programs." Declaration of Mary Habib, Jan. 20, 1998, ¶ 12.

(2) As a part of the proposal, the offeror shall provide the Contracting Officer with complete information of previous or ongoing work that is in any way associated with the contemplated acquisition.

(b) If award is made to the offeror, the resulting contract may include an organizational conflict of interest limitation applicable to subsequent Government work, at either a prime contract level, at any subcontract tier, or both. During evaluation of submitted proposals, the Government may, after discussions with the offeror and consideration of ways to avoid the conflict of interest, insert a special provision in the resulting contract which will disqualify the offeror from further consideration for award of future contracts.

(c) The organizational conflict of interest clause included in this solicitation may be modified or deleted during negotiations.

2. *Plaintiff's proposal and OCI mitigation plan*

In response to the RFP, Informatics Corporation ("plaintiff"), designated a small disadvantaged business operating under the United States Small Business Administration's ("SBA") 8(a) program, 15 U.S.C.A. § 637(a) (West.Supp.1997), submitted a proposal stating that all SETA work would be performed by plaintiff itself or by one of three subcontractor team members: Operational Technologies ("OpTech"), Team LC, or SMS. Although none of these subcontractors held any direct contracts with AFCEE, OpTech held two subcontracts under two AFCEE contracts for environmental remedial work to be performed at Otis Air Force Base. At the time it submitted its proposal, plaintiff held another contract with AFCEE, as a subcontractor to the SBA, to perform "community relations" work with respect to base-closure programs.[6] Pursuant to this contract, which expires on January 25, 1999,

and covers a nine-state area, plaintiff had performed work at five Air Force bases. Plaintiff's work now involves only Lowry Air Force Base and requires approximately 24 hours of work per week, generating $60,-000.00 in revenues per year.

By letter dated August 8, 1997 to Mary Habib, the Contracting Officer for the Program Support Branch, HSC/PKV at Brooks Air Force Base, plaintiff requested written clarification that the contracting officer agreed that it had no OCI regarding its AFCEE community relations/administrative record contract. In her August 20, 1997 response, Ms. Habib informed plaintiff that "[t]he successful SETA contractor must be eligible/qualified to perform on all orders. There are currently no provisions in either the SETA solicitation or the Community Relations Contract to allow the successful offeror to decline delivery/task orders."[7] Ms. Habib also stated that the OCI clause "applies to the prime contractor and all subcontractors. Because OPTECH is a contractor or subcontractor on a current AFCEE contract, the inclusion of OpTech as a subcontractor/teaming member would most likely create an OCI." Ms. Habib did not specify whether plaintiff's community relations contract presented a potential OCI, although defendant argues that her reference to the Community Relations contract in regard to declining delivery orders implicitly communicated that this contract did pose an OCI. Finally, Ms. Habib concluded:

An OCI Mitigation Plan based on the contractor's discretion in accepting SETA orders and[/]or orders under all of its other AFCEE contracts would not resolve the OCI. Under an Indefinite Delivery/Indefinite Quantity (IDIQ) contract, the contractor does not have the option of refusing orders issued within the minimum/maximum order limitations of the contract.

---

**6.** Paragraph 1.1.2 of plaintiff's community relations contract requires the contractor to "provide the lead management and professional services to support the Community Relations Program to facilitate communication among the U.S. Air Force; other federal, state, and local agencies; interested groups; and other community residents concerning the IRP [installation restoration program] at the closing facility."

**7.** The organizational conflict of interest provision, section 1–141 Alternate IV (July 1997) (e), states that "[t]he Contractor agrees to accept and to complete all issued Task Orders, and not to contract with Government prime Contractor or first-tier subcontractors in such a way as to create an organizational conflict of interest."

By letter dated August 21, 1997, plaintiff proposed several measures to avoid or mitigate a potential OCI involving either OpTech or itself.[8] Ms. Habib informed plaintiff, by letter dated August 27, 1997, that although the opinion stated in her August 20th letter remained unchanged, a timely proposal would be reviewed in accordance with the terms and conditions of the RFP.

Plaintiff submitted its initial proposal in response to the SETA RFP on August 29, 1997. On September 17, 1997, the contracting officer resumed discussions with plaintiff and the following day sent plaintiff a letter requesting clarification on several points unrelated to OCIs. By letter dated October 15, 1997, Ms. Habib asked plaintiff to "clarify [its] understanding that SETA work is not community relations or data management work," but did not otherwise refer to the OCI issue.

On October 28, 1997, plaintiff submitted an "OCI Disclosure and Avoidance" statement and an "OCI Mitigation Strategy and Plan." Shortly thereafter, on October 31, 1997, the contracting officer requested plaintiff's Best and Final Offer, which plaintiff submitted in a timely manner. Plaintiff inferred that this request, coupled with the lack of a response to its mitigation plan, signified that its plan was deemed acceptable. Indeed, Ms. Habib's Memorandum to the Solicitation File, dated October 31, 1997, stated that plaintiff "has been determined to be Technically Acceptable after review of their response to discussion questions dated 28 October 1997."

On December 18, 1997, plaintiff was informed that the two contracts were awarded to Universe Technologies and to JM Waller Associates, Inc., with a program ceiling not to exceed $46.1 million. Although plaintiff's proposal was deemed technically acceptable, and its bid was the second lowest—$3.92 million less than JM Waller's bid—the contracting officer excluded plaintiff from further consideration because of perceived OCIs for both OpTech and itself.

On January 5, 1998, the Air Force debriefed plaintiff regarding the contract; the OCI issue in particular consumed much of the two-hour telephonic debriefing. Several weaknesses in plaintiff's proposal were identified. The Air Force team reiterated that no provisions in either the SETA contract or plaintiff's community relations contract allowed the contractor to decline delivery/task orders in order to avoid or mitigate an OCI. The memorandum to the solicitation file, which recaps the debriefing, indicates that "[i]n our written response to the offeror's questions about a Mitigation Plan, the Government explained that an OCI Mitigation Plan based on the contractor's discretion in accepting orders on any AFCEE contract would not resolve the OCI." During the debriefing plaintiff maintained that "the two perceived OCIs were not OCIs, were not significant OCIs, and in any event, were easy to mitigate." Compl. filed Jan. 9, 1998, ¶ 34.

In its six-count complaint, plaintiff contends that the contracting officer 1) violated Federal Acquisition Regulation ("FAR") § 9.504(e), 48 C.F.R. § 9.504(e) (1997), by failing to consider plaintiff's OCI mitigation plan and award it the contract; 2) failed to follow the Armed Services Procurement Act's

---

8. Plaintiff's letter attempted to clarify "some misunderstandings" that plaintiff may have had with Ms. Habib during their verbal exchange on August 8, 1997. Plaintiff explained:

1. OpTech is a lower tier subcontractor at Otis AFB (MMR) only. Informatics will self perform any Otis AFB work. For any work at Otis, this OCI mitigative measure should be completely acceptable to AFCEE, as it is fully acceptable to other Government Agencies under similar contractual circumstances.

2. Informatics has a Community Relations/Administrative Record contract for BRAC bases only in a seven state mid-western region. We are currently active at Lowry and Carswell AFB's only. As previously discussed, this is a support contract and would most likely not merit any SETA support or oversight. In the unlikely event this contract would require SETA involvement, Informatics could assign work to other members of the Team....

It appears from reading your referenced response, that the only OCI mitigative measures considered and discussed by Informatics was declining task orders under existing contracts. We want to clarify any misunderstanding by again stating that various OCI mitigative options are available other than declining task orders under existing contracts.

In closing, we respectfully disagree with your interpretations on potential OCI and would be willing to discuss this matter with you at your earliest convenience.

evaluation criteria for determining whether an OCI exists; 3) treated competing contractors more favorably than plaintiff; 4) acted in an arbitrary and capricious manner in determining that plaintiff's proposal presented an OCI that precluded mitigation; 5) failed to engage in meaningful discussions with plaintiff regarding the possibility that its community relations contract constituted an OCI; 6) improperly evaluated competing proposals.

Plaintiff moved for temporary and preliminary injunctive relief on January 9, 1998. Following a hearing held on January 12, 1998, by an order issued that day, the court denied plaintiff's motions and consolidated them, pursuant to RCFC 65(a)(2), in order to determine plaintiff's entitlement to a permanent injunction, which the parties agree was to be resolved on the basis of the administrative record, as supplemented.

## DISCUSSION

### 1. *Standard of review*

Congress amended the Tucker Act in 1996 by granting the Court of Federal Claims jurisdiction to hear post-award bid protest actions. 28 U.S.C.A. § 1491(b)(4) (West Supp.1997). In *GraphicData, LLC v. United States*, 37 Fed.Cl. 771, 778–80 (1997), this court examined the legal history culminating in this expansion of the court's jurisdiction. The Tucker Act amendments specify that the applicable standard of review is that set forth in the Administrative Procedure Act (the "APA"). Pursuant to the APA, a court can hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(2) (1994), which is the ground upon which plaintiff bases the relief sought.[9]

■ Federal law on post-award bid protests attempts to balance two principles—an agency's autonomy in making procurement decisions and the bidder's right to reasonable treatment by the procuring agency. Federal agencies "are entrusted with a good deal of discretion in making procurement decisions."

*Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed.Cir.1994) (citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958–59 (Fed.Cir.1993), and *Tidewater Management Servs. Inc. v. United States*, 216 Ct.Cl. 69, 84, 573 F.2d 65, 73 (1978)). In order to ensure that agencies do not abuse this discretion, Congress empowered the Court of Federal Claims and federal district courts to override the agency decision-making process when a disappointed bidder proves that an agency action was unreasonable and resulted in both "a significant error in the procurement process," *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996), and clear prejudice to the bid protestor. *Id.* at 1562 (explaining prejudice as but for "the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract").

■ "A conflict of interest exists when the contractor's objectivity may be impaired due to the nature of the work to be performed." *KPMG Peat Marwick*, B–255224, 94–1 CPD ¶ 111. It is well settled that the contracting agency's determination regarding a conflict of interest should not be disturbed, "unless it is shown to be unreasonable." *Id.; see also NKF Eng'g Inc. v. United States*, 805 F.2d 372 (Fed.Cir.1986) (finding contracting officer's decision disqualifying low bidder based on appearance of impropriety not "unreasonable or irrational"); *Calspan Corp.*, B–258441, 95–1 CPD ¶ 28 (deeming reasonable contracting officer's determination that OCI mitigation plan was acceptable); *Aetna Gov't Health Plans, Inc.; Foundation Health Fed. Servs., Inc.*, B–254397.15, B–254397.16, B–254397.17, B–254397.18, B–254397.19, 95–2 CPD ¶ 129 (finding OCI could not be mitigated); *SysteMetrics, Inc.*, B–220444, 86–1 CPD ¶ 163 (finding OCI inherent in contract award and steps to mitigate deemed inadequate). "Mere disagreement with the contracting officer's evaluation does not itself render the evaluation unreasonable." *Litton Sys., Inc.*, B–237596.3, 90–2 CPD ¶ 115.

---

9. Alternatively, a disappointed bidder may argue that the award violated an applicable procurement regulation. *See Central Arkansas Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995); *Cleveland Telecomms. Corp. v. Goldin*, 43 F.3d 655, 659 (Fed.Cir.1994).

### 2. *Consideration of plaintiff's mitigation plan*

FAR §§ 9.500–9.508 govern organizational conflicts of interest, and FAR § 9.504(e) provides the standard against which the contracting officer's actions are measured:

> The contracting officer shall award the contract to the apparent successful offeror *unless a conflict of interest is determined to exist that cannot be avoided or mitigated.* Before determining to withhold award based on conflict of interest considerations, the contracting officer shall notify the contractor, provide the reasons therefor, and allow the contractor a reasonable opportunity to respond. If the contracting officer finds that it is in the best interest of the United States to award the contract notwithstanding a conflict of interest, a request for a waiver shall be submitted in accordance with [section] 9.503.

(Emphasis added.)

■ Of the many arguments that it propounds,[10] plaintiff's most compelling argument is that AFCEE violated FAR § 9.504(e) by failing to consider whether any potential OCIs could be avoided or mitigated, or by improperly determining otherwise. Plaintiff charges that the contacting officer "never even considered whether the alleged OCI's presented by Informatics' proposal could be avoided, neutralized, or mitigated," Plf's Br. filed Feb. 3, 1998, at 3, as required by FAR § 9.504(a)(2).

On October 28, 1997, plaintiff submitted to AFCEE an "OCI Disclosure & Avoidance" statement and an "OCI Mitigation Strategy & Plan," which demonstrated how both alleged OCIs—arising from plaintiff's community relations contract and OpTech's existing subcontracts—could have been avoided or mitigated. With respect to plaintiff's community relations subcontract, plaintiff first proposed that AFCEE could assign to the other SETA contractor any community relations oversight work to be performed at any of the Air Force bases for which plaintiff has performed or might perform work.[11] Plaintiff contends that either AFCEE or plaintiff itself could monitor and recognize community relations work and assign such Task Orders to the other SETA contractor. Moreover, plaintiff maintains, nothing in the SETA contract precludes AFCEE from reassigning a particular Task Order to avoid an OCI. Second, plaintiff proposed that community relations oversight tasks could be delegated to one of plaintiff's subcontractors (OpTech, Team LC, or SMS). Third, plaintiff proposed that the SBA could novate the community relations contract.[12] With regard to OpTech's OCIs, the mitigation plan noted that the other Informatics Team members could accept tasks that would pose an OCI with OpTech's remedial work at Otis Air Force base, or the other SETA contractor could be assigned such work. The mitigation plan also stated that to avoid an OCI, OpTech would "pursue severing its subcontract relationship with [the prime contractor] upon contract award."[13]

The record, as supplemented, contains scant evidence that the contracting officer considered plaintiff's OCI mitigation plan;

---

10. Plaintiff proffers several other arguments that the court has considered carefully and are preserved for the record, but need not be addressed.

11. Plaintiff does dispute, however, whether the broadly written SETA SOW even encompasses oversight of community relations work because it does not refer to such work explicitly.

12. Plaintiff made this suggestion in its OCI Disclosure and Avoidance statement, noting that it would "[r]equest and work with AFCEE to transition the Community Relations work to alternative qualified AFCEE contractors with the scope and expertise to provide quality community relations services." Plaintiff proffered a letter dated January 9, 1998, from the SBA to the effect that, as the contractor with AFCEE, the SBA would have allowed novation of plaintiff as subcontrac-

tor. Because this letter post-dated the award and, more importantly, because AFCEE, not the SBA, is the client agency in charge of determining OCIs, the court disregards the SBA's letter.

13. Defendant objects that the mitigation plan should have reflected that OpTech already had severed its relationship. The problem with this position is that until the proposed mitigation plan was accepted, the actual severing of a contractual relationship could be premature. However, the court observes that the plan did not commit OpTech to any future action, so that the contracting officer had a reasonable basis upon which to question this aspect of plaintiff's mitigation proposal.

rather, the evidence raises serious doubts about the extent and quality of the deliberation afforded plaintiff's plan. If FAR § 9.504(e) means anything, it is that the contracting officer must determine that an OCI cannot be avoided or mitigated in order to deny contract award to an otherwise qualified offeror. Consequently, the contracting officer actually must determine whether a proposed mitigation plan could mitigate or avoid a perceived or potential OCI. Three areas of the record, as supplemented, warrant examination in this regard.

1) First, two months before plaintiff submitted its OCI mitigation plan, the contracting officer, Ms. Habib, in an August 8, 1997 query to AFCEE's Staff Judge Advocate, stated that

> "the offeror [Informatics] asked me this date if the company were to include an 'OCI mitigation Plan' (as they currently do for DOE), would that be sufficient for the OCI clause in the SETA solicitation. I am not comfortable with a "mitigation" plan in order to comply with our OCI clause, and request your opinion."

On August 19, 1997, the Staff Judge Advocate responded,

> I have not seen such a[n OCI mitigation] plan, but I would assume that the crux would be the contractor's discretion in accepting SETA orders and/or orders under all of its other AFCEE contracts. As we discussed, the SETA contractor will not have that discretion. Consequently, such a mitigation plan would not resolve the OCI.

Defendant insists that "the record establishes ... extensive communication between Informatics and the contracting officer about Informatics' OCIs and full consideration by the contracting officer of all aspects of Informatics' OCIs, including any proposals by Informatics to avoid or mitigate the OCIs." Def's Br. filed Feb. 26, 1998, at 2. On the contrary, the record as a whole manifests nothing more than a conclusory statement that the contracting officer examined each of plaintiff's mitigation options set forth in its mitigation proposal. It is curious that the record reveals little actual consideration of the mitigation plan; in fact, the contracting officer appears to have determined that the perceived OCIs could not be mitigated before she actually saw the mitigation plan, which was submitted on October 28, 1997. The contracting officer's earlier statement, in her August 8, 1997 query, also implies that she was unfamiliar with the requirement set forth in FAR § 9.504(e) that she "award the contract to the apparent successful offeror unless a conflict of interest is determined to exist that cannot be avoided or mitigated." This provision contemplates the use of mitigation proposals. Moreover, the solicitation provision L–2 5352.209–9003, Potential Organizational Conflict of Interest (AFMC) (July 1997), states that the "organizational conflict of interest clause included in this solicitation may be modified or deleted during negotiations." [14] Although a contracting officer is under no obligation to modify or delete the OCI clauses, this was another option about which record shows the contracting officer to be unaware.

2) The second area of the record that addresses the contracting officer's consideration of plaintiff's OCI mitigation plan is found in the Post Negotiation Memorandum drafted by Ms. Habib on December 16, 1997, which documents the award decisions under the SETA contract. To support its assertion that "[t]he contracting officer considered Informatics' OCI mitigation plan," Def's Proposed Findings of Uncontroverted Fact No. 40, filed Feb. 12, 1998, defendant cites this Post Negotiation Memorandum, which states:

> AFCEE clearly considered the standard AFMC OCI clause and how to mitigate one OCI problem. However, from a Program Management perspective, it is not reasonable for the Air Force to manager [sic] four separate OCI issues [15] on behalf of a

---

**14.** Similarly, FAR § 9.503, entitled, "Waiver," states: "The agency head or a designee may waive any general rule or procedure of this subpart by determining that its application in a particular situation would not be in the Government's interest. Any request for waiver must be in writing, shall set forth the extent of the conflict, and requires approval by the agency head or a designee."

**15.** Apparently three of these conflicts resulted from OpTech's subcontracts at Otis Air Force Base and one conflict resulted from plaintiff's

contractor. The OCI Strategy and Mitigation Plan proposed by IT [Informatics Team] was reviewed at length. Awarding a contract with the four OCI circumstances presented by IT [Informatics Team] would create unnecessary delays, burdensome information requirements, and excessive documentation.

In accordance with FAR Part 9, we did notify the IT [Informatics Team] and did provide a reasonable opportunity to respond to the OCIs. The mitigation plan was not sufficient to allow award and be in compliance with the AFMC Clause 5352.209-9002, Jul 1997 at paragraph 1–141 of the solicitation.

FAR § 9.504(e) states that "[b]efore determining to withhold award based on conflict of interest considerations, the contracting officer shall notify the contractor, provide the reasons therefor, and allow the contractor a reasonable opportunity to respond." Although the Post Negotiation Memorandum claims that plaintiff's team was notified of the potential OCIs, the record reveals that plaintiff was only notified of the OCI for OpTech; the contracting officer did not mention the OCI involving plaintiff's community relations contract, let alone the fact that it was unmitigatable, until after denying plaintiff the contract. The court finds that plaintiff itself gave the contracting officer notice of its potential OCI, so that plaintiff was not prejudiced by this oversight.[16]

FAR § 9.504(d) states that "[i]n fulfilling their responsibilities for identifying and resolving potential conflicts, contracting officers should avoid creating unnecessary delays, burdensome information requirements, and excessive documentation," as the Post Negotiation Memorandum recites. This provision continues, explicating that "[t]he contracting officer's judgment need be formally documented only when a substantive issue concerning potential organizational conflict of interest exists." FAR § 9.504(d). Herein lies the conundrum. The contracting officer failed to document formally her judgment regarding the adequacy of the mitigation plan. It is thus virtually impossible to ascertain, in retrospect, whether the contracting officer considered plaintiff OCI mitigation plan and, if so, how specifically the plan failed to avoid or mitigate the apparent OCIs pursuant to FAR § 9.504(e). Unfortunately, Ms. Habib's declaration does little to shed light on this question, as she does not discuss whether and how she considered the OCI mitigation plan.

Ms. Habib's declaration, submitted in support of defendant's cross-motion for summary judgment,[17] focuses on whether plaintiff and OpTech presented OCIs and how she interpreted the OCI clauses. Ms. Habib interpreted the organizational conflict of interest clauses to restrict "the SETA contractor and its subcontractor from having or entering into a contract or subcontract to supply environmental supplies or services for the same work that it reviews as a SETA con-

community relations subcontract. It is unclear, however, why the contracting officer stated that "AFCEE considered the standard AFMC OCI clause and how to mitigate *one OCI problem.*" (Emphasis added.)

16. Plaintiff insists, notwithstanding its anticipatory OCI mitigation plan, that it was prejudiced by not being so notified, as it could have bolstered its presentation of a mitigation measure it had only hinted at before: asking the SBA to novate its community relations subcontract. The court discounts the SBA's letter agreeing to novation for the reasons discussed *supra* at note 12.

17. The court may consider evidence outside of the administrative record, such as an affidavit from the contracting officer, here, in "limited situations" which include, *inter alia,* " '(1) when the agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to

its final decision; ... (8) in cases where relief is at issue, especially at the preliminary injunction stage.' " *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997) (quoting *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989)).

By order entered on January 12, 1998, the court directed defendant to submit the Air Force's binding interpretation of the OCI provisions. The predicate for this order was plaintiff's challenge to the contracting officer's interpretation of the provisions as reaching both a contractor, *e.g.,* plaintiff and a subcontractor, *e.g.,* OpTech. The court finds the Air Force's interpretation to be reasonable. However, nothing in the order prohibited defendant from offering Ms. Habib's *post facto* explanation for her determination. Indeed, she discussed her evaluation of potential OCIs of several other potential offerors.

tractor." Declaration of Mary Habib, Jan. 20, 1998, ¶ 14.

Ms. Habib explained her "interpretation of the OCI clause to specific potential conflicts with respect to individual firms." Habib Decl. ¶ 22. Several potential offerors inquired about how the SETA contract could pose OCI issues vis-a-vis existing contracts. Problematically, these companies had existing contracts that were so similar in nature and scope to the SETA contract [18] that they presented a high likelihood that a future Task Order on the SETA contract would pose conflicts with an existing contract, or conflicts that might be difficult to resolve. Although given the same information as other potential offerors, plaintiff argues that its community relations subcontract (and OpTech's subcontracts) can be distinguished in that they are highly unlikely to pose an OCI—both in terms of geography and scope—and easily can be monitored to avoid or mitigate a potential OCI in the future.

In evaluating whether plaintiff had any OCIs, Ms. Habib explained that because the SETA contractor could be called upon to write Statements of Work for community relations-type services, a conflict would arise "when the SETA contractor and the Community Relations contractor are one in the same." Habib Decl. ¶ 22d(i). Similarly, she claimed that a conflict would also arise "when the SETA contractor reviews the work products submitted by the Community Relations contractor." *Id.* Ms. Habib also determined that the SETA contractor might be called upon to review the subcontracting work performed by OpTech, a proposed member of plaintiff's team. *Id.* ¶ 22d(ii).

Notwithstanding her assertions, Ms. Habib fails to explain specifically how plaintiff's mitigation plan would fail to avoid or mitigate the OCIs in accordance with FAR § 9.505(e). A conflict would only arise, for example, if a SETA Task Order required plaintiff to write a Statement of Work for community relations work that it would perform at one of a hand-

ful of Air Force bases, or if it was called upon to review the work of OpTech, its subcontractor, which does remedial work at Otis Air Force Base. The record does not explain why the contracting agency could not monitor the Task Orders to insure that, for the duration of plaintiff's existing subcontract—then approximately one year remaining of the contract's five-year term—it would not be assigned Task Orders that would conflict with the narrow work that it or OpTech performed at a handful of Air Force bases.

Before and after plaintiff submitted its OCI avoidance statement and mitigation plan, the contracting officer maintained that an OCI could not be avoided because the solicitation does not allow a contractor to decline a Task Order. *See supra* note 7. However, the provision in question, which was not drafted clearly, prohibits the contractor from creating OCIs in the future, *see* section L–2(2)(b) of the solicitation, quoted ·*supra* at 4. It does not only refer to existing contracts that could create an OCI, but also could be mitigated, *e.g.*, by assigning community relations work at particular Air Force bases to the other SETA contractor. This provision thus does not rule out a plan to mitigate an OCI when both contractors are qualified to accept Task Orders.

3) Third, during the January 5, 1998 debriefing, the contracting officer's memorandum to the solicitation file stated that the Government reviewed plaintiff's OCI Disclosure and Avoidance statement and found that it did not resolve the potential OCI issues for several reasons:

> The successful SETA contractor may be called upon to write Statements of Work for Community Relations and related efforts for the existing small business administration contracts to perform Community Relations. The fact the Informatics holds one of these contracts would cause an OCI. The Informatics existing contract with AFCEE for Community Relations Support could not be modified into the SETA Statement of Work after award. The

---

**18.** For example, Labat Anderson Inc., was a prime contractor for AFCEE on an Environmental Services Contract for Worldwide Sites, and included a Statement of Work that appeared to overlap with the Statement of Work for the SETA

contract. After being informed by Ms. Habib of the strong possibility of an OCI, the company decided not to propose on the SETA contract. Habib Decl. ¶ 22(ii).

Community Relations efforts are, first, out of scope of the SETA SOW, and secondly, they are reserved for award under the 8(a) Program to the Small Business Administration. Moving the work from the Informatics contract to another contract also presents scope issues, as these contracts were awarded regionally.

Again, the memorandum did not explain with any specificity, as contemplated by FAR § 9.504(d), why the OCIs could not be avoided or mitigated. The memorandum even confuses the issue by announcing that "Community Relations efforts are, first, out of the scope of the SETA SOW." Defendant offers the explanation that this statement "means that the SETA contractor will not perform substantive community relations work, as does Informatics under its current contract." Def's Br. filed Feb. 26, 1998, at 8–9.

4) Plaintiff offered the contracting officer several options for avoiding an OCI. One option common to both plaintiff and OpTech was tasking the other SETA contractor. The contracting officer apparently rejected this proposal out of hand. The record is bereft of any analysis, factual predicate, example, or rational support that this option will "create unnecessary delays, burdensome information requirements, and excessive documentation," as the contracting officer stated in her Post Negotiation Memorandum. The contracting officer's consideration of plaintiff's mitigation plan did not comply with FAR § 9.504(d) because she did not explain her judgment why plaintiff's OCI could not be avoided or mitigated, pursuant to FAR § 9.504(e).

In these circumstances the court finds that plaintiff has established that the contracting officer acted unreasonably in concluding that plaintiff manifested, through itself or its subcontractor, an unavoidable or unmitigable OCI.

3. *Additional showings for injunctive relief*

■ In addition to demonstrating the presence of an unreasonable action, plaintiff must make three additional showings to warrant issuance of an injunction: 1) that failure to enjoin the procurement will cause plaintiff to suffer specific and irreparable harm; 2) that such harm to plaintiff outweighs that which would be incurred by the Government and third parties should plaintiff prevail; and 3) that the grant of injunctive relief is in the public interest. *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977); *see also FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993); *Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 795 (1991). No one factor is dispositive, although when granting injunctive relief, the weakness of any one factor may can be overcome by the strength of the other factors. *See FMC,* 3 F.3d at 427.

■ Plaintiff has demonstrated that absent injunctive relief it would suffer irreparable harm by the loss of anticipated profits from a contract award. Furthermore, an action at law would be unavailing, because plaintiff could recoup only its bid preparation costs in a suit for damages. *See M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1302 (D.C.Cir.1971); *Essex Electro Eng'rs, Inc. v. United States,* 3 Cl.Ct. 277, 287 (1983) (citing cases).

The balancing of harms is not decisive. Another contractor holds the contract, which was awarded three months ago; the contract will be terminated if plaintiff qualifies for award. *See, e.g., PCI/RCI v. United States,* 36 Fed.Cl. 761, 776 (1996). During oral argument defendant made two points that factor into the balancing equation. First, potential offerors allegedly declined to propose on the RFP because they understood that they would be unable to decline SETA Task Orders, or by, implication, be unable to shift tasks that would cause an OCI with an existing contract to the other SETA contractor. Allowing plaintiff to mitigate an OCI by substituting the other SETA contractor would, defendant argued, be akin to changing the rules, to the detriment of those potential offerors which were denied the opportunity to propose on the RFP. However, these companies were never told that they could not propose on the RFP, or submit a mitigation plan to address the potential OCIs. As plaintiff rejoined during oral argument, these

companies saw the same solicitation and regulations and made a business decision not to propose on the RFP. Other companies were never precluded from drafting a mitigation plan as plaintiff did, nor need they have been dissuaded by the contracting officer's view that a contractor could not decline a task order. The FAR contemplates a determination that the OCI cannot be avoided or mitigated; thus, the contracting officer actually must consider whether avoidance or mitigation will be possible, which necessitates actual consideration of an OCI mitigation plan.

Second, lodging another appeal to policy considerations, defendant argued that allowing plaintiff to mitigate by contractor substitution would set a harmful precedent. Defendant fears that both plaintiff and future contractors could seek to decline Task Orders in order to avoid a future OCI and thus preserve their ability to bid or propose on future contracts, thereby frustrating the procurement process. The OCI provision insures against this precise situation. *See supra* note 7.

The decisive criterion in this case is the third, whether injunctive relief is in the public interest. *See, e.g., Parcel 49C Ltd. Partnership v. United States*, 31 F.3d 1147, 1154 (Fed.Cir.1994); *PCI/RCI*, 36 Fed.Cl. at 776; *Essex Electro Eng'rs*, 3 Cl.Ct. at 288. Plaintiff offered nearly a $4 million savings over the awardee, JM Waller. Although the public has an interest in assuring the integrity of the procurement process, it also has an interest in "minimizing the cost of federal procurements." *Vanguard Sec. Inc. v. United States*, 20 Cl.Ct. 90, 113 (1990). Defendant does not dispute that, absent the OCI, plaintiff was a qualified offeror. Nor can defendant dispute that Ms. Habib's resistance to plaintiff's proposals for avoiding or mitigating the OCIs was based on the need to make any adjustment, however minor, that would call for the Air Force to monitor plaintiff's and OpTech's other contracts.

The cost savings to the fisc of almost $4 million—approximately 9% of the contract ceiling—must be weighed against the Air Force's potential obligation to monitor these few activities and to approve substitutions of contractor responsibilities should conflicts arise. The low projected incidence of OCIs, coupled with the fungibility of the other SETA contractor for plaintiff or for OpTech, tilts the balance toward the public interest in exploring with plaintiff whether the OCIs could be mitigated or avoided without compromising the mission in order to obtain this significant savings. The OCI regulations contemplate a flexibility that was not explored. Defendant's justifications amount to *post-hoc* rationalizations to justify an expensive procurement decision that serves neither the fisc nor sound contract administration.

## CONCLUSION

Accordingly, based on the foregoing, plaintiff's cross-motion for summary judgment is granted, and defendant's motion for summary judgment is denied. The Clerk of the Court shall enter judgment for plaintiff consistent with the following.

**IT IS ORDERED**, effective March 10, 1998:

1. The Department of the Air Force, AF-CEE, HSC/PKV, their officers, agents, and employees, are enjoined from proceeding with the performance of Contract No. F41624–97–R–8001 in respect of JM Waller, Inc., through April 10, 1998, and thereafter, should HSC/PKV find plaintiff eligible for award pursuant to ¶ 2 hereof.

2. The HSC/PKV shall evaluate plaintiff's Best and Final Offer and otherwise determine plaintiff's eligibility for the SETA contract by April 10, 1998.

3. Counsel for defendant shall communicate by no later than 3:00 p.m. on March 10, 1998, the contents of this order to the contracting officials of HSC/PKV and shall deliver to them as soon as practicable a copy of this opinion.

4. The parties are allowed 5 business days within which to identify protected/privileged material subject to deletion before this opinion is issued for publication.

No costs.