The CUBE CORPORATION, Plaintiff,

v.

UNITED STATES, Defendant,

and

R & D Maintenance Services, Inc., Intervenor.

No. 99–914C.

United States Court of Federal Claims.

Feb. 22, 2000.

Lynda Troutman O'Sullivan, Miller & Chevalier, Chtd., Washington, D.C., attorney or record for the plaintiff; David F. Dowd, Lisanne E.S. Cottington, of counsel.

William W. Stewart, Jr., Commercial Litigation Branch, Civil Division, U.S. Dept. of Justice, Raleigh, NC, Harold D. Lester, Jr., Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, attorneys of record for the defendant; Connie

Ledford, U.S. Army Corps of Engineers, Savannah District, Savannah GA, of counsel.

Ira E. Hoffman, Grayson and Associates, P.C., McLean, VA, attorney of record for the intervenor; Alan M. Grayson, Brian T. Scher, of counsel.

## OPINION

HORN, Judge.

This action for declaratory and injunctive relief centers on a United States Army Corps of Engineers contract award for the operation and maintenance of government facilities at Hartwell Lake, South Carolina. A disappointed bidder on the Corps of Engineers solicitation, Cube Corporation, filed a protest of the award on October 26, 1999 with the United States General Accounting Office, then withdrew the protest and filed its original complaint with the United States Court of Federal Claims on November 2, 1999. The plaintiff also submitted a motion for a temporary restraining order and preliminary injunction to this court, which was dated November 3, 1999, but filed by the Clerk's Office on November 5, 1999. A hearing was held on November 4, 1999, during which the court denied the plaintiff's motion for a temporary restraining order and preliminary injunction.

The plaintiff then filed a first amended complaint on November 22, 1999, and a motion for permanent injunctive relief on December 9, 1999. On December 20, 1999, the defendant filed a response to the plaintiff's motion, accompanied by a motion for summary judgment based on the administrative record. On January 10, 2000, the awardee of the Corps of Engineers contract and intervenor, R & D Maintenance Services, Inc., also filed a motion for judgment based on the administrative record. The court held oral argument on the parties' cross motions on January 11, 2000. The plaintiff seeks a declaration that the award by the Corps of Engineers to R & D Maintenance was improper, and direction to the Corps to terminate the contract with R & D Maintenance and award to Cube; or, in the alternative, direction to the Corps of Engineers to resolicit the work.

## FINDINGS OF FACT

The Corps of Engineers solicitation at issue, No. DACW21–99–R–0001, requested proposals for services relating to the maintenance, repair, minor construction and operation of government facilities at Hartwell Lake, South Carolina, including a hydro electric dam, power plant, and pumping station, as well as campgrounds, parks and boating areas. The procurement is a 100 percent set aside for small business. The predecessor contractor, Ferguson–Williams, Inc., could no longer qualify as a small business, but was proposed by Cube, a small business, as its major subcontractor on the solicitation.

The solicitation contemplated a cost plus award fee contract for a base period and four option years. Award was to be made to the offeror whose proposal provided the "best overall value" to the government. After review of their initial proposals, Cube and R & D Maintenance both were deemed to be within the competitive range. After discussions closed, Cube submitted a final proposal with a total proposed cost of [DELETED], and R & D Maintenance submitted a final proposal with a total proposed cost of $14,380,522.00. In spite of R & D Maintenance's higher cost proposal, on October 15, 1999, the Corps of Engineers awarded the contract to R & D Maintenance, reflecting the Corps of Engineers' view of the latter's proposal as the best overall value to the government. Contract performance by R & D Maintenance was scheduled to began November 1, 1999.

The solicitation required offerors to propose manpower to be assigned to the various tasks listed in Section C, which contains the specifications/work statement. Section C is supplemented by Section J, which includes attachments such as wage rate classifications, maps of the various sites, dumpster locations, lists of government furnished equipment and instructions on planting shrubs and trees. Section C also is supplemented by Section L, which contains instructions, conditions and notices to the offerors.

Section L.10 is titled the "Work Breakdown Structure," (WBS) and provides as a preamble to the section that: "The following data is provided to assist offerors in prepar-

ing cost proposals and is the Government's estimate of work to be performed for these items yearly. This list is not inclusive and the offeror must refer to the entire technical specifications to determine a cost for the work to be performed." After this introductory language, section L.10 contains six pages of items quantifying the nature of the work; for example, the number of signs which will require maintenance/replacement are listed (1420 signs), the amount of electric line to be laid during a year (500 feet), and the number of docks to be built (one dock). The items listed in Section L.10 are tied to the specifications/work statement in Section C. For example, the government's estimate of the number of signs (1420) also references Technical Provision TP–HL–8.1, which is contained in Section C, and provides that:

> The Contractor will replace or repair all damaged or outdated signs as coordinated by the project sign coordinator. Temporary wooden signs will be routed. Permanent signs are engineer grade aluminum or HDO plywood as specified by the sign coordinator. Stains, paints, and reflective material utilized will be as specified by the Corps Sign Manual, Volume 1 and 2. Approximately 10–15 percent of the project signs will be replaced with new signs from UNICOR each year of this contract. All signs will be procured from UNICOR in accordance with Corps Sign Manual Vol. 1 and Vol. 2. The contractor will track orders to insure they are received in a timely fashion and will inventory all orders received to insure quality.

The solicitation required offerors to propose manpower in man-hours assigned to each of the tasks described in Section C, as supplemented by Sections J and L.

Section M of the solicitation, titled "Evaluation Factors for Award," provided that award may be made to "other than the offeror submitting the lowest priced offer," and, "to the offeror submitting the proposal determined to be the most advantageous to the Government." Section M continues:

> 3.c. Award will be made to that offeror whose proposal contains the combination of those criteria described in this document offering the best overall value to the Government, considering Soundness of Approach, Management, Past Performance, and Cost, whose costs are otherwise determined to be fair and reasonable. This will be determined by comparing differences in the value of Soundness of Approach, Management, Past Performance and differences in cost to the government. In making this comparison, the Government is more concerned with obtaining superior Soundness of Approach and Management than with making an award at the lowest overall cost to the Government. However, the Government will not make an award at a significantly higher overall cost to the Government to achieve slightly superior Soundness of Approach and Management features.

> \* \* \* \* \* \*

> 4.2 Soundness of Approach is More Important than Management. Management is More Important than Past Performance and Cost. Past Performance and Cost are Equal. Soundness of Approach, Management and Past Performance will be evaluated without reference to cost. Cost will be evaluated separately.

The Corps of Engineers ranked the proposals based on five adjectival ratings: Exceptional, Above Average, Acceptable, Marginal, and Unacceptable. Cube received an overall evaluation score of Acceptable; R & D Maintenance received an overall score of Above Average. The Source Selection Evaluation Board made the following recommendation to the Source Selection Authority, based on the Technical Evaluation Team and the Cost Team evaluations and comparative analysis of the proposals:

> While it initially appeared that award to Offer[or] 3 [R & D Maintenance] would result in a significant cost premium over Offeror 1 [Cube], the above trade off analysis demonstrates that there is no significant cost premium. Offeror 3's proposal reflects a complete proposal that includes sufficient levels of supervision, quality control, and manpower to efficiently accomplish the work. This work could be accomplished without undue oversight by the Government, and without frequent rework on the part of

the contractor while controlling costs. In the case of Offeror 1, the comparison with historical contract expenditures, equipment cost, and the proposed shortage of man-hours are clear indicators that Offeror 1 would encounter significant cost overruns during performance and pose significant risk in the areas of performance, quality and scheduling. Therefore, based on the above discussion and considering the higher technical ratings of Offeror 3 in the areas of Soundness of Approach, Management, and Past Performance, I believe that Offeror 3's proposal would provide the best overall value to the Government and, therefore, recommend award to Offeror 3.

The Source Selection Authority made the award decision to R & D Maintenance, on the following basis:

1. Based on the information provided by the TET [Technical Evaluation Team], I have determined Offeror # 3's [R & D Maintenance's] technical approach to meeting the requirements of this solicitation is substantially superior when compared to the other two offerors. Offeror # 3's adequacy of approach and methodology in its proposal development and analysis of the solicitation's requirements are clear and convincing.

2. In addition, Offeror # 3's cost proposal reflects realism based on the scope and effort required in maintaining a high level of service at Hartwell. Their offer represents a proposed cost that provides best value to the government when consideration is given to actual costs under current market conditions and technical and functional capabilities of this offeror. Their cost proposal is both reasonable to the offeror and the government.

3. I do not feel that Offeror # 1's [Cube's] technical approach and supporting cost proposal adequately addresses the scope of the solicitation. Their apparent low proposal cost over the life of the contract is not realistic based on substantive historical cost data and its use in the development of a "should cost" determination by the government.

4. I have confidence in Offeror # 3's ability to successfully perform this contract as proposed and concur with the recommendation of the TET that contract award be made to Offeror # 3.

The plaintiff contends that the Corps of Engineers improperly evaluated proposals based on a greater workload than was reflected in the solicitation, conducted an unreasonable cost evaluation, failed to conduct meaningful discussions, evaluated the proposals unequally, unreasonably evaluated the proposals and unfairly selected R & D Maintenance for the award in spite of a [DELETED] percent cost premium unjustified by "very little, if any" technical superiority.

## DISCUSSION

*Motion for Judgment on the Administrative Record*

The plaintiff has filed a motion for permanent injunctive relief. Defendant and intervenor have responded with separate motions for judgment on the administrative record. RCFC 56.1 of the Rules of the United States Court of Federal Claims (RCFC) treats such motions as motions for summary judgment under RCFC 56(a). *Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996), *aff'd*, 113 F.3d 1255 (Fed.Cir.1997) (Table). Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party must demonstrate that the moving party is entitled to judgment as a matter of law and that there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598,

26 L.Ed.2d 142 (1970); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996) (*reh'g denied*); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir. 1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lane Bryant, Inc. v. United States,* 35 F.3d 1570 (Fed.Cir.1994). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is appropriate when the sole dispute concerns the interpretation of a government contract, a question of law. *See Olympus Corp. v. United States,* 98 F.3d 1314, 1316 (Fed.Cir.1996).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Company v. United States,* 157 F.3d 849, 854 (Fed.Cir.1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In such a case, there is no need for the parties to undertake the time and expense of a trial,

and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed. Cir.1998) (*reh'g denied*); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985). In the case of parties making cross-motions for summary judgment, each motion must be judged independently and the court must view the evidence in the light most favorable to the other party. *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir. 1987).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994) (*reh'g denied*); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings

already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

In the above-captioned case, the parties agree that summary judgment is appropriate and have filed affidavits, documents and joint stipulations of fact. Moreover, no material issues of disputed fact have been identified by the parties or the court.

*Standard of Review*

■■■ The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act and also provided the United States Court of Federal Claims with post-award bid protest jurisdiction, concurrent with that of Federal district courts, for actions filed on or after December 31, 1996. *See* 28 U.S.C. § 1491(b)(1)-(4) (1994 & Supp. II 1996). The statute provides that post-award protests of agency procurement decisions are to be reviewed under Administrative Procedure Act standards. Agency procurement actions may be set aside when they are determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). *Ramcor Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1290 (Fed.Cir.1999); *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 779 (1997). This court may "override the agency decision-making process when a disappointed bidder proves that an agency action was unreasonable and resulted in both 'a significant error in the procurement process,' *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) *(reh'g denied ),* and clear prejudice to the bid protestor." *Informatics Corp. v. United States,* 40 Fed.Cl. 508, 513 (1998).

Under an arbitrary and capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). So long as the relevant factors were considered and there was a rational basis for the decision, the agency's action will be upheld. According to case law the reviewing court:

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975).

■■■ The solicitation in the above-captioned case contemplated a negotiated procurement, in which contracting officers are generally afforded greater decision making discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement...." *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 686 (1985) (citing *Sperry Flight Sys. v. United States,* 212 Ct. Cl. 329, 339–340, 548 F.2d 915 (1977)); *accord CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 726 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). In *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590 (1980), the court described the broad discretion afforded a contracting officer in a negotiated procurement, as follows:

> Remarking on the contracting officer's discretion in negotiation the court in *Sperry Flight Systems Division v. United States,* 212 Ct.Cl. 329, 339, 548 F.2d 915, 921

(1977) noted that "... the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for ..." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising. *See Keco II*, 203 Ct.Cl. [at] 574, 492 F.2d [at] 1204 [(1974)].

*Id.* at 65, 617 F.2d 590. *See also United Int'l Investigative Servs. v. United States*, 41 Fed. Cl. 312, 319 (1998); *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 663, 671–72 (1997).

The United States Court of Appeals for the Federal Circuit, citing *Burroughs* and other cases, has reaffirmed the principle, as follows:

> Effective contracting demands broad discretion. *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980); *Sperry Flight Sys. Div. v. United States*, 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); *see NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 377 (Fed.Cir.1986); *Tidewater Management Servs., Inc. v. United States*, 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); *RADVA Corp. v. United States*, 17 Cl.Ct. 812, 819 (1989), *aff'd*, 914 F.2d 271 (Fed.Cir.1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Tidewater Management Servs.*, 573 F.2d at 73, 216 Ct.Cl. 69. . . .

*Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958–59 (Fed.Cir.1993). *Accord Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995 (Fed.Cir.1996); *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed.Cir.1994); *Wackenhut Int'l, Inc. v. United States*, 40 Fed.Cl. 93, 105 (1998).

The wide discretion afforded to contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. "[W]here an agency's decisions are highly technical in nature ... judicial restraint is appropriate and proper." *Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985) (citations omitted). As stated by the United States Supreme Court:

> Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on "engineering and scientific" considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact.

*Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600, *reh'g denied*, 405 U.S. 948, 92 S.Ct. 929, 30 L.Ed.2d 819 (1972). *See also Compubahn v. United States*, 33 Fed.Cl. 677, 682–83 (1995) ("this court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted). In any case, the question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but rather, whether the conclusions reached by the agency lacked a reasonable basis, and, thus, were arbitrary and capricious. "In simple terms, courts should not substitute their judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably." *Commercial Energies, Inc. v. United States*, 20 Cl.Ct. 140, 145 (1990) (citations omitted). *See Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d at 959; *Redland Genstar, Inc. v. United States*, 39 Fed.Cl. 220, 231 (1997); *Mike Hooks, Inc. v. United States*, 39 Fed.Cl. 147, 154 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. at 672.

As noted earlier, the court's bid protest jurisdiction, as effective following December 31, 1996, provides for award of "any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2) (1994 & Supp. II 1996). Prior

to this legislation, for pre-award bid protests, "[t]he theory on which an unsuccessful bidder is awarded its bid preparation costs is that the government violated its '"implied contract to have the involved bids fairly and honestly considered."'" *E.W. Bliss Co. v. United States,* 77 F.3d 445, 447 (Fed.Cir. 1996) (citing *CACI, Inc.—Fed. v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 (Fed.Cir.1983) (in banc))). *See Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132, 1132 n. 5 (Fed. Cir.1998). The standard of review used for the implied contract theory is the four-part *Keco II* test, which also is instructive for cases filed under the 1996 statute. *See also GraphicData, LLC v. United States,* 37 Fed. Cl. 771, 779 (1997) ("The standard of review applied by the Court of Federal Claims in pre-award bid protests cases is identical to the standard now imposed on the court by the amendment to the Tucker Act."); *United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. at 318.

■ The United States Court of Claims set forth factors in *Keco II* to be considered when determining whether the government has acted arbitrarily or capriciously toward a bidder-claimant: (1) whether there was subjective bad faith on the part of the procuring officials, thus depriving the bidder of fair and honest consideration of its proposal; (2) whether there was a reasonable basis for the administrative decision; (3) the degree of discretion given to the procurement officials by applicable statutes and regulations, which determines the degree of proof of error necessary to demonstrate a right to recovery; and (4) whether government officials violated pertinent statutes or regulations, which, if violated, may form the basis for recovery, but need not do so automatically. *Keco Indus., Inc. v. United States (Keco II),* 203 Ct.Cl. 566, 574, 492 F.2d 1200 (1974); *see also Southfork Sys., Inc. v. United States,* 141 F.3d at 1132; *Cincom Sys., Inc.,* 37 Fed.Cl. at 671, 676–77; *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 355–56 (1994), *aff'd,* 39 F.3d 1198 (Fed.Cir.1994).

In *E.W. Bliss Co. v. United States,* the United States Court of Appeals for the Federal Circuit offered further guidance on the applicable standard of review:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H,* 75 F.3d 1577 (Fed. Cir.1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.,* B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted). Bliss has not shown that the Mint abused its discretion in awarding the contract to Pressmasters.

\* \* \* \* \* \*

> Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement."); ...

*E.W. Bliss Co. v. United States,* 77 F.3d at 449.

■ To prevail in a bid protest case, the protester also must demonstrate prejudice. 5 U.S.C. § 706(2) (1994) ("due account shall be taken of the rule of prejudicial error").

Expanding on the requirement, the United States Court of Appeals for the Federal Circuit has held that

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General,* 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica,* 102 F.3d at 1582; *see CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, " 'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration' " (citation omitted)).

*Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999) (*reh'g denied* ) (alterations in original).

### Scope of Work

■ The plaintiff first argues that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation, and not on unstated criteria. This is an unremarkable proposition, enshrined in procurement statute and regulation, and uncontested by the defendant. *See* 10 U.S.C. § 2305(b)(1) (1994) ("[A]n agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."); 48 C.F.R. § 15.305(a) (1998) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.") *See Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1368.

Plaintiff notes that the solicitation contained the government's estimate of the quantity of work to be performed in the Work Breakdown Structure (WBS), which the plaintiff relied on in preparing its proposal. Plaintiff attempts to contrast the WBS estimates in the solicitation with the Government Estimate of $13,867,666.00, which, according to the plaintiff, should be consistent with the WBS, but which plaintiff believes was based on the historical cost outlays of the preceding contract for the operation and maintenance of government facilities at Hartwell Lake. Plaintiff points out, for example, that the total cost to the government of the predecessor contract (less an award fee which has not yet been determined) was $13,855,025.29, while the Government Estimate for the contract currently under protest, as noted above, is similar: $13,867,666.00. Plaintiff contends that the preceding contract involved work far in excess of the work reflected in the WBS estimate, but the Government Estimate in dollar outlays for the two solicitations are similar. According to the plaintiff, therefore, the Government Estimate in the current solicitation must be far in excess of the more limited WBS in the current solicitation.

Accordingly, the plaintiff concludes that its proposal was evaluated based on the Government Estimate's (and the preceding contract's) scope of work, and not the scope of work reflected in the WBS of the solicitation. In the plaintiff's words:

> The Government Estimate was based on a historical workload that contained a significantly greater scope of work than the RFP [Request for Proposals]. The historical workload was used to evaluate proposals and to conclude that Cube's proposal was unrealistic. It thus was an unstated evaluation factor that infected all key aspects of the evaluation and source selection decision.

In this regard, the Source Selection Decision Summary, signed by the Source Selection Evaluation Board Chairman and recommending selection of R & D Maintenance, observed that "Offeror 1 [Cube] is significantly lower than the historical expenditures and the Government Estimate." Cube proposed an average of [DELETED] per year; the source selection document noted that this was [DELETED] less than the historical expenditures under the preceding contract,

and [DELETED] per year less than the Government Estimate for the contract at issue.

The Source Selection Decision Summary continued:

> Since the Government Estimate is based upon project needs, which is supported by historical contract expenditures, Offeror 1's [Cube's] total costs are not considered real. It would be extremely difficult for the Offeror 1 to perform the work contained in the proposal at an acceptable level at his proposed cost. If Offeror 1 is awarded this contract, the Government believes Offeror 1's actual costs will be closer to the Government Estimate and historical expenditures, and the government could realize a total contract cost increase of [DELETED].

> If you add the difference of the actual cost increase to Offeror 1's proposed cost of [DELETED] and compare it with Offeror 3's [R & D Maintenance's] cost there is only a difference of [DELETED] between the two proposals. Offeror 3's cost estimates are much closer to the Government estimate and historical contract expenditures, consequently, Offeror 3's proposed cost are [sic] more reasonable, real and present [sic] the lowest cost risk to the Government. Offeror 3 could perform at an acceptable level at the cost estimates given. It is unlikely Offeror 1 could perform at its proposed cost. Also when the completeness of Offeror 3's technical proposal is considered in conjunction with the best quantity and level of labor mix, there is an indication that there could be less rework. Therefore, Offeror 3 could maintain the preferred level of quality, service and performance at a reasonable cost to the Government.

The Source Selection Authority, in making the award to R & D Maintenance, relied on the Source Selection Decision Summary, and based the award decision at least in part on the government's view that Cube's proposal was unrealistic:

> 3. I do not feel that Offeror # 1's [Cube's] technical approach and supporting cost proposal adequately addresses the scope of the solicitation. Their apparent low proposal cost over the life of the contract is not realistic based on substantive historical cost data and its use in the development of a "should cost" determination by the government.

The defendant's position is that: "In establishing a Government estimate for anticipated contract costs, an agency may reasonably consider historical costs for similar work previously performed." Furthermore, the defendant denies that "the Government estimate [in this case] was based on quantities of work in excess of those set forth in the solicitation." Among the factual issues for the court, therefore, are whether the Government Estimate reflected the scope of the preceding contract, as the plaintiff alleges, or the scope of the WBS in the current contract, as the defendant alleges, and, as a result, were the proposals evaluated against the workload and historical outlays of the predecessor contract, as reflected in a Government Estimate which was similar numerically to those historical outlays, or, were the proposals evaluated against the current contract WBS workload, which was properly reflected in that same Government Estimate (and which happened to be similar to the historical outlays of the preceding contract)?

In support of its contention, the plaintiff compared selected items of workload from the preceding contract with the current contract's Work Breakdown Structure. Plaintiff's analysis concludes that:

> In the last three years of the preceding contract, the incumbent contractor incurred and invoiced the Government for work above and beyond the quantities specified in the Solicitation's WBS in the amount of [DELETED]. Exhibit B. The WBS quantities were exceeded by similar amounts in the first two years of the contract, for an approximate extra cost of [DELETED] per year. Multiplied by five years, the cost of work above and beyond the Solicitation's WBS quantities was approximately [DELETED]. If this amount is added to Cube's proposal [DELETED], which was based on the Solicitation's WBS quantities, the total comes to [DELETED]—very close to the Government Estimate ($13,867,666).

Plaintiff prepared and submitted the above cited "Exhibit B," which is a chart comparing the workload quantities in the Work Breakdown Structure estimates with the workload quantities in the preceding contract for 23 selected items (e.g., paving, tree planting, etc.) grouped under 12 specifications/work statement sections (e.g., TP–HL–12.3[1], Installation of Utilities). Plaintiff placed a dollar figure on the workload quantities being compared to attempt to demonstrate that dollar outlays under the preceding contract (which were similar to the current contact's Government Estimate) exceed the likely cost of the WBS estimates in the contract at issue. For example, the WBS of the current solicitation estimated a quantity of 500 feet of electric line under Section TP–HL–12.3, Installation of Utilities. Plaintiff's analysis compares the predecessor contract's quantity of electric line of 50,798 feet for three years, 1997—1999, with the 500 feet estimated under the current solicitation's WBS (multiplying the 500 feet per year by three years). Costing out the extra dollars associated with the extra quantity led to several hundred thousand dollars in costs which are, in the plaintiff's words, "excess over WBS," for this single item, and also for the other 22 items the plaintiff selected for analysis.

The plaintiff argues that "[a]ll [the plaintiff's] Exhibit B was designed to do was to demonstrate that work done under the prior contract included substantial work in excess of the current Solicitation's WBS quantities." An examination of the plaintiff's Exhibit B, however, leads the court to the conclusion that the monetary Government Estimate does not appear to have adopted the outlays from the preceding contract, but properly reflected the current workload estimates of the WBS for the contract at issue. For example, in the current contract, the Scope of Work for Section TP–HL–12 includes materials for the following:

*Scope of Work:* The Contractor will furnish all labor, equipment, supplies, and materials to repair or construct impact sites, small operational buildings, bulkheads and gabion walls, swales, and berms.

Renovation of park facilities will be accomplished according to plans and specifications provided by the COR [Contracting Officer Representative].

The Government Estimate for TP–HL–12 includes [DELETED] for materials ("stone, sand, site furniture, grounds materials, etc.") for the base year of the current contract, and [DELETED] for five years (base year plus four option years). The costs for the electric line, courtesy docks, playgrounds, underground waterline, gabion walls, and rip rap included by the plaintiff under TP–HL–12 in its Exhibit B would be included, along with other costs, in the approximately [DELETED] per year. The dollar amounts for these items in the plaintiff's Exhibit B far exceed the amounts in the Government Estimate. If the Government Estimate had blindly tracked the outlays of the prior contract, then the Government Estimate and the prior outlays would be similar. But the outlays are not similar. The Government Estimate reflects the WBS estimates rather than the actual quantities and outlays under the prior contract. Therefore, in reviewing the plaintiff's own data compiled in the plaintiff's Exhibit B, the Government Estimate does not appear to track the predecessor contract, as argued by the plaintiff.

The plaintiff's Exhibit B also includes the outlays for office partitions and re-roofing Clemson pump stations in the preceding contract, but provides no estimates for these same items in the WBS. As indicated by the plaintiff, this work was not recurring and is not contained in either the current WBS—or in the Government Estimate. Similarly, the plaintiff's Exhibit B includes outlays under the preceding contract for shutter/exhaust fans, heating panels, a gate and fence at the power plant, replacement of air conditioning at the power plant, new fence around the resource office, carpet in the resource office, powerhouse insulation, sidewalks, radios and phone conduit. If the Government Estimate were merely repeating the outlays of the previous contract, rather than tailoring the Government Estimate to the estimates in the WBS, all of these items would be included in

---

1. "TP" stands for Technical Provision, "HL" for Hartwell Lake work provisions, and "HP" for Hartwell Dam and Powerplant and Clemson Pumping Station work provisions.

the Government Estimate. However, estimates were zero for these items in the solicitation's WBS, and properly were not included in the Government Estimate, contrary to the theory proposed by the plaintiff.

The plaintiff's Exhibit B compares paving work between the WBS estimates and the previous contract's outlays. Exhibit B notes the 1,250 square yards estimated for the WBS, and [DELETED] square yards, costing an average of [DELETED] for the years 1997—1999, under the predecessor contract. The Government Estimate was [DELETED] for the base year, and [DELETED] for five years, serving as a reflection of the WBS estimate rather than of the cost of outlays under the prior contract. Similarly, the plaintiff's Exhibit B reflects that 467 buoys and signs cost [DELETED] for 1997—1999. The WBS estimated 60 buoys and signs per year; the Government Estimate of [DELETED] for five years was based on 50 buoys. Therefore, once again, the Government Estimate reflected not the outlays for this category under the prior contract, but the WBS estimate.

The plaintiff's Exhibit B also notes the 1000 tons of sand for beaches in the WBS estimates compared to the [DELETED] tons used in the prior contract during 1997—1999. The Government Estimate averaged [DELETED] per year, compared to over [DELETED] that amount per year expended under the prior contract for the three years selected by plaintiff. Therefore, the Government Estimate once again reflects the WBS quantities rather than the prior contract quantities. Finally, the plaintiff's Exhibit B reported [DELETED] trees removed in 3 years (compared to an estimate of 10 in the WBS for 5 years) and [DELETED] seedlings planted in 3 years (compared to 3,000 in the WBS for 5 years). The Government Estimate does not contain any entries for these items, and, once again, cannot be said to be reflecting the higher outlays of the predecessor contract.

Furthermore, the Government Estimate contained work included in the WBS but not in the prior contract. For example, emergency spill response support is found in the WBS under Section TP–HL–13, and also is

found in the Government Estimate in an amount of [DELETED] for the base year and [DELETED] for the five years. This workload is another strong indication that the Government Estimate properly followed the WBS rather than blindly repeating the outlays under the prior contract. Similarly, new crane work and hauling services is found in the WBS under Section TP–HP–11, and also is found in the Government Estimate in an amount of [DELETED] for the base year and [DELETED] for the five years.

The government also updated labor rates from the prior contract, e.g., reflecting an increase from [DELETED] per hour to [DELETED] per hour for parking attendants in the Government Estimate. The WBS estimated 5—10 parking attendants; the Government Estimate based its figures on [DELETED] parking attendants. Again, this consistency between the WBS and the Government Estimate does not support the plaintiff's thesis. Similarly, the Government Estimate was adjusted to reflect a rate increase in various types of equipment, reflecting fine tuning in the derivation of the Government Estimate rather than rote reproduction of outlays under the prior contract.

The plaintiff makes clear that it is not the use of historical costs to which it objects, but use of a Government Estimate which reflects not the scope of the solicitation, but unstated needs. As the above analysis of the plaintiff's Exhibit B figures indicates, the plaintiff has not convinced the court that the Corps of Engineers based its Government Estimate on unstated criteria derived from the previous contract, rather than on the workload contained in the WBS and other portions of the solicitation at issue in this case.

*Evaluation of the Cost Proposals*

■ The plaintiff also argues that the government "may not base its cost evaluation against a qualitatively different standard than that covered by the instant solicitation," and that the different standard in the instant case was a greater scope of work than was reflected in the solicitation. Although the plaintiff states its position in slightly different terms, this argument was addressed above. The plaintiff failed to demonstrate to

the court that the Government Estimate was based on unstated needs, rather than properly reflecting the Work Breakdown Structure estimates and other sections of the solicitation.

The plaintiff next argues that, even if the Government Estimate was not flawed, the government failed to determine the "most probable cost," as required by 48 C.F.R. § 15.404–1(d)(2) (1998) ("Cost realism analyses shall be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror.") The Federal Acquisition Regulation continues:

(i) The probable cost may differ from the proposed cost and should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal. The probable cost shall be used for purposes of evaluation to determine the best value.

(ii) The probable cost is determined by adjusting each offeror's proposed cost, and fee when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis.

48 C.F.R. § 15.404–1(d)(2)(i), (ii). Defendant responds that cost realism analysis was performed on the proposals, and notes that agency evaluators enjoy broad discretion in conducting such analyses. In *CTA Inc. v. United States*, the court observed that:

In general, "contracting officers are vested with wide discretion with regard to the evaluation of bids." *Labat–Anderson, Inc. v. United States*, 42 Fed.Cl. 806, 846 (1999). "Decisions on cost realism are within the agency's sound discretion and expertise, and the judgment will not be overturned absent any rational basis." Steven W. Feldman, *Government Contract Awards* § 11:16 n. 8 (1998) (citing *Halifax Technical Serv., Inc. v. United States*, 848 F.Supp. 240 (D.D.C.1994)). "Reflecting this broad discretion, plaintiff has an unusually heavy burden of proof in showing that the [acceptability] determination ... was arbitrary and capricious." *Id.* (internal quotation marks and citations omitted). "Plaintiff's burden is to demonstrate that the agency's determination lacked a rea-

sonable basis." *Labat–Anderson*, 42 Fed. Cl. at 846.

*CTA Inc. v. United States*, 44 Fed.Cl. 684, 693 (1999) (alterations in original). *See also Scientific and Commercial Sys. Corp.*, B–283160.2, 1999 WL 999498, at *18 (C.G. Oct. 14, 1999); *TRW, Inc.*, B–282162.2, 1999 WL 485030, at *4 (C.G. June 9, 1999).

A review of the Source Selection Decision Summary indicates that the government evaluated the proposals for cost realism and performed a probable cost analysis. The source selection document advises that:

As part of the cost/technical tradeoff, a comparison was made with Hartwell Project's historical contract expenditures for the past five years, the Government Estimate, and the Offeror's [sic] overall cost proposals.

\* \* \* \* \* \*

Offeror 1's [Cube's] fourth option year only increased by [DELETED] over its base year cost. Such a [DELETED] increase after four years is not realistic. Consequently, the Offeror's proposed cost lacks realism and presents a cost risk to the Government.

Since the Government Estimate is based upon project needs, which is supported by historical contract expenditures, Offeror 1's total costs are not considered real. It would be extremely difficult for the Offeror 1 to perform the work contained in the proposal at an acceptable level at his proposed cost. If Offeror 1 is awarded this contract, the Government believes Offeror 1's actual costs will be closer to the Government Estimate and historical expenditures, and the Government could realize a total contract cost increase of [DELETED].

If you add the difference of the actual cost increase to Offeror 1's proposed cost of [DELETED] and compare it with Offeror 3's cost there is only a difference of [DELETED] between the two proposals.

The source selection document reflects that cost realism was not only employed, but properly played an important role in the evaluation. As noted above, the government identified the plaintiff's probable cost as

[DELETED]. The court finds that a cost realism analysis was conducted, and had a reasonable basis. Although the plaintiff would have conducted the cost realism analysis differently,[2] the government's cost realism analysis was not unreasonable and was well within its discretion.

*Meaningful Discussions*

The plaintiff next argues that the Corps of Engineers failed to conduct meaningful discussions. With respect to discussions of offerors' proposals, the Federal Acquisition Regulation provides that:

> (2) The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation.
>
> (3) The contracting officer shall ... indicate to, or discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal (such as cost, price, technical approach, past performance, and terms and conditions) that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. The scope and extent of discussions are a matter of contracting officer judgment.

48 C.F.R. § 15.306(d)(2), (3) (1998). The plaintiff argues that disadvantages to its proposal mentioned in the Source Selection Decision Summary were actually significant weaknesses which should have been raised with the plaintiff, but were not. For example, plaintiff believes that the following disadvantage should have been part of discussions:

> The Offeror [Cube] demonstrated a "will comply" more than a "how it will be done" in several of the TP write-ups. For example, in TP–HL–10 (Boundary Line Maintenance) where the Offeror states that boundary maintenance will be accomplished at the conclusion of the grass mowing season, no adequate description of the approach nor methodology was given as to how the work would be performed.

The defendant notes that the solicitation itself placed the parties on notice of this distinction between assertion of the willingness to comply, and how offerors actually propose to comply ("The offeror shall address 'how' he proposes to comply rather than 'will comply in accordance with ...'"). Similarly, plaintiff argues that the disadvantage of "not adequately address[ing] how the supervision, management, personnel administration, oversight/services will be provided for the large amount of subcontracted activity," should have been part of discussions. Defendant responds, once again, that the solicitation calls for management proposals which show all positions in management and lines of authority ("Each Management proposal shall provide the following: Management Organizational Chart which clearly shows all positions in management and lines of authority. Lines of authority may be shown through the home office, however proposals must show the local structure."). When the solicitation clearly calls for the items in question, as here, it is not incumbent on the government to unduly assist or "spoon-feed" an offeror. *See Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 835 (1999) ("[A]gencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal," quoting *Furuno U.S.A., Inc.,* B–221814, 86–1 CPD ¶ 400, at 5); *Du & Assocs., Inc.,* B–280283.3, 1998 WL 892043, at *5 (C.G. Dec. 22, 1998) ("[T]he agency is not required to 'spoon-feed' an offeror as to each and every item that could be revised so as to improve its proposal. This is especially the case where, as here, the RFP evaluation criteria and instructions to offerors on proposal preparation are detailed and clear with respect to the problem areas.") (citations omitted); *The Communities Group,* B–283147, 1999 WL 1132149, *3 (C.G. Oct. 12, 1999).

The plaintiff argues that another disadvantage listed in the Source Selection Decision Summary also should have been the subject

---

**2.** The plaintiff's analysis places its probable cost at [DELETED], and R & D Maintenance's proba- ble cost at [DELETED].

of meaningful discussions. The disadvantage was that:

The offeror did not adequately respond to the work level listed in the solicitation. The Offeror was short a total of [DELETED] man-years. TP–HL–3 (Maintain Buildings, Structures, Mechanical, Electrical, Water Supply, and Sewage Disposal Systems) was short [DELETED] man-years and TP–HL–4 (Maintenance of Grass, Trees and Landscaped Areas) was short [DELETED] man-years when compared to the Government Estimate (supported by historical contract data over the previous five years at Hartwell). This difference is considered to be a significant disadvantage and raises doubt about the Offeror's ability to perform at an acceptable level.

On July 21, 1999, however, the contracting officer sent his second set of clarifications to Cube. (Fourteen clarifications and two deficiencies had been provided to Cube earlier, on May 27, 1999.) Included in the second list was the following clarification: "Your estimated labor quantity and unskill/skill mix seem inconsistent with the solicitation requirements for TP–HL–3. Please clarify." In response, Cube's proposed, major subcontractor, Ferguson–Williams, performed a workload analysis, which concluded:

In light of these findings, and a further detailed comparison of the TP–HL–3 specifications, requirements, and quantities contained in the solicitation against our proposed staffing to accomplish the work, we are confident that out [sic] initial estimating process was accurate and the original results still remains [sic] our best estimate—considering the specific data contained in the solicitation.

[DELETED].

Another clarification in the July 21, 1999 letter indicated that: "Your estimated labor quantity seems inconsistent with the solicitation requirements for TP–HL–4. Please clarify." In this case, Cube agreed with the contracting officer's clarification, and indicated that Cube had increased the labor estimate for TP–HL–4, "to include additional labor hours in both the Tractor Operator and the Laborer, Grounds Maintenance classifica-

tions, in order to reflect a more consistent labor estimate commensurate with the solicitation requirements." In the case of this disadvantage, in light of these clarifications associated with Sections TP–HL–3 and TP–HL–4, the court finds that reasonable indications were provided to the plaintiff in compliance with Federal Acquisition Regulation requirements.

Other disadvantages in the area of Soundness of Approach included Cube's proposed use of [DELETED]. In this last regard, the contracting officer's July 21, 1999 clarification letter raised the [DELETED] of vehicles by asking Cube to "furnish the year of manufacture for each vehicle shown in the Equipment Summary List," which Cube did, reflecting its [DELETED] vehicle fleet. Surveying the disadvantages, the government rated Cube Acceptable in Soundness of Approach, which is defined as: "Meets minimum standard requirements. Fair estimates on manpower and equipment. Good probability of success. No significant disadvantages."

Disadvantages in the area of Management included Cube's proposed use of an [DELETED]. Cube's approach to the inventory/supply function was the [DELETED] response, addressed earlier in reference to the "tell how it will be done" approach clearly required by the solicitation ("The offeror shall address 'how' he proposes to comply rather than 'will comply in accordance with …' "). The government rated Cube [DELETED] in Management. In Past Performance, the Source Selection Decision Summary noted Cube's single Cost Plus Award Fee contract experience on a smaller contract than the solicitation contemplated, but was rated, once again, [DELETED], defined, as noted above, to include a [DELETED].

In the requirement to have "discuss[ions] with" or provide "indicat[ions] to" offerors, the Federal Acquisition Regulation speaks of significant weaknesses and deficiencies, and matters "that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award." 48 C.F.R. § 15.306(d)(3). A "significant weakness" is defined by the FAR as "a flaw [in the proposal] that appreciably

increases the risk of unsuccessful contract performance." 48 C.F.R. § 15.301. A "deficiency" is defined as "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." *Id.* Plaintiff has not convinced the court that the disadvantages which were not shared with Cube meet these somewhat stringent definitions. The disadvantages listed above do not rise to the level of "material failures," rendering the risk of unsuccessful contract performance unacceptable, or constitute flaws of such magnitude that appreciably increase the risk of unsuccessful contract performance, or even provide an opportunity to enhance "materially" the chance for award. Plaintiff has not demonstrated how disadvantages on the order of [DELETED] would have improved materially Cube's chance for award. *See ACRA, Inc. v. United States,* 44 Fed.Cl. 288, 295–96 (1999) ("[T]he government 'need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others,'") citing *Development Alternatives, Inc.,* B–279920, 1998 WL 546017, at *5 (C.G. Aug. 6, 1998). Furthermore, considerable leeway is provided to the contracting officer by the FAR itself in the area of discussions ("The scope and extent of discussions are a matter of contracting officer judgment."). 48 C.F.R. § 15.306(d) (3). The court finds that the government's compliance with the FAR requirement for discussions was reasonable and adequate when reviewing the issues raised by the plaintiff and in the context of the proposal submitted by the plaintiff to the solicitation.

*Evaluation of the Technical Proposals*

■ The plaintiff also had a number of complaints about the government's technical evaluation of Cube's proposal. Plaintiff initially argues that both Cube and R & D Maintenance "received substantially similar [DELETED] ratings from one of their references," but only Cube's ratings were considered by the government to be [DELETED]. Plaintiff is referring to one past performance rating [DELETED] which contained [DE-LETED], which was not mentioned in the Source Selection Decision Summary. The solicitation, however, contemplated a cost plus award fee (CPAF) contract, so it was not unreasonable for the Source Selection Decision Summary to focus on CPAF contract experience. Plaintiff disputes neither its [DELETED] nor R & D Maintenance's extensive CPAF experience, factors which drove plaintiff's Acceptable rating and R & D Maintenance's [DELETED] rating in Past Performance.

Plaintiff next complains that [DELETED] in its proposal was criticized, while [DELETED] excess man years in R & D Maintenance's proposal were characterized as a correctable problem. The government noted that Cube's proposed [DELETED] was no longer needed since a GSA contract reduced [DELETED]. This is a reasonable criticism. As for R & D Maintenance's [DELETED] man years, upon further examination the government noted that foreman hours had been included in Management rather than in the applicable Technical Provisions, and that R & D's proposal had an overall labor balance and very good labor quantities, such that the overage was not considered a significant risk. This underlying rationale of the evaluators on R & D's proposal was not disputed by the plaintiff, nor was the underlying comment on plaintiff's [DELETED]; together, they provide a reasonable basis for the distinction between the two proposals.

Next, the plaintiff complains that both Cube and R & D proposed only [DELETED], but that only Cube was significantly downgraded. In this regard, the Source Selection Decision Summary notes that:

[DELETED] can not effectively handle this workload. Due to [Cube's] other labor shortages, this is a definite cost risk for [Cube]. However, the Technical Evaluation Team (TET) found [R & D's] organizational chart to be very sound, well balanced and followed very closely to the Government estimate. In light of how balanced and close to the Government Estimate and the rest of [R & D's] Management structure is, [R & D] could easily overcome the shortage of [DELETED].

The government has provided a reasonable basis for the varying impact of [DELETED] in the two proposals.

Plaintiff argues that only Cube proposed the required trucks, but that R & D nevertheless was scored higher for this subfactor. Cube was rated [DELETED] in Equipment Utilization; R & D was rated Above Average. The Source Selection Decision Summary notes that Cube proposed [DELETED] vehicles than were appropriate for the task, and also proposed an [DELETED] of vehicles. This provides a reasonable basis for the rating in this subfactor. The Source Selection Decision Summary noted that R & D was short four pickup trucks, and concluded that "the potential increase in cost of $108,000.00 for 4 vehicles is considered minor with comparison to the total proposed contract amount of $14,380,522.24." R & D did not propose the [DELETED] trucks criticized by the government that Cube proposed. On R & D's [DELETED] as Cube proposed, [DELETED]. The government had a reasonable basis for the evaluation and ratings of equipment.

The plaintiff also complains that the government downgraded its proposal for man-year shortages, but discounted R & D's failure to provide "cleaning coverage." The Source Selection Decision Summary concluded that: "[Cube] did not adequately respond to the work level listed in the solicitation and underestimated the Governments [sic] requirement. [Cube's] shortage of man-years, [DELETED] ... can potentially cause some disruption of schedule, increase in cost, or degradation of performance." As for R & D, the Source Selection Decision Summary stated that:

> [R & D] failed to show 2 parks in the cleaning schedule for 2 months which presents some minor risks due to the fact that some schedule revisions will have to occur and subsequently affect cleaning cost estimates. However, the Government would not experience any significant cost increases due to the low usage occurring within these two parks during the two months (October and November) as cleaning schedules are normally reduced significantly during these months.

The government has provided a reasonable basis for its evaluation of these "man-year shortage/cleaning coverage" factors.

Finally, the plaintiff argues that the government gave both offerors the same score for Qualifications [DELETED], even though Cube's proposed project manager had considerably more experience than R & D's proposed project manager and Cube argues its staff was more qualified than R & D's staff. The Source Selection Decision Summary, in addressing the Qualifications for Management Positions subfactor for R & D, stated: "The overall management qualifications were good. The Quality Control section had very strong qualifications. The Contract Manager has 8 years experience as a Contract Manager, although at a small project." The [DELETED] rating received by R & D for the management qualifications subfactor is defined as: "[DELETED]." The source selection summary provides a reasonable basis for the rating described in this definition. The source selection summary for Cube stated: "Qualification for the proposed management staff were good. The evaluation found proposed staff members were familiar with work area and Project facilities, which is an advantage." The source selection summary provides a reasonable basis for also rating Cube [DELETED], rather than the next higher rating, [DELETED], which is defined as: [DELETED].

Plaintiff would understandably rate the proposals differently, but the true test is whether the government had a reasonable basis for the ratings absent arbitrary or capricious conduct of the agency. The court will not substitute its judgment for that of the agency. In the judgment of the court, the plaintiff has not demonstrated that the government acted arbitrarily or capriciously in its award of ratings to Cube or R & D. *See Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d at 959 (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (holding that administrative decisions may not be set aside "simply because the court is unhappy with the result reached.")); *TRW, Inc.,* B-282162.2, 1999 WL 485030, at *5 (C.G. June

9, 1999) ("Under the circumstances, TRW's challenge to this aspect of the agency's evaluation constitutes, at best, its mere disagreement with the evaluation results, and as such, does not provide a basis to find the evaluation unreasonable.") (citations omitted); *Technical & Administrative Servs. Corp.*, B–279828, 1998 WL 681275, *2 (C.G. July 24, 1998) ("It is not the function of this Office to independently evaluate proposals. Rather, the determination of the relative desirability and technical adequacy of proposals is primarily a matter of agency discretion, which we will not disturb unless it is shown to be without a reasonable basis or inconsistent with the stated evaluation criteria. A protester's mere disagreement with the agency's evaluation is not itself sufficient to establish that the evaluation was unreasonable.") (citations omitted).

*Best Value Determination*

■ Plaintiff also argues that the government's "best value" determination was arbitrary and capricious. Section M of the solicitation, titled "Evaluation Factors for Award," provides that:

M.3 Basis for Award "Best Value Evaluation"

a. The Government reserves the right to ... award a contract to other than the offeror submitting the lowest priced offer; and to award a contract to the offeror submitting the proposal determined to be the most advantageous to the Government.

Plaintiff contends that the award was improper for a number of reasons, including a flawed Government Estimate, unequal treatment of offerors, failure to conduct meaningful negotiations, and failure of the government to use probable costs. These arguments, however, were raised, addressed and dismissed above, and will not be readdressed.

Plaintiff also argues that R & D's proposal was rated only [DELETED] above Cube's proposal, but reflected a substantial cost premium. As noted earlier, R & D's cost proposal was $14,380,522.00; Cube's cost proposal was [DELETED]. Section M.3 of the solicitation provided that:

c. Award will be made to that offeror whose proposal contains the combination of those criteria described in this document offering the best overall value to the Government, considering Soundness of Approach, Management, Past Performance, and Cost, whose costs are otherwise determined to be fair and reasonable. This will be determined by comparing differences in the value of Soundness of Approach, Management, Past Performance and differences in cost to the [G]overnment. In making this comparison, the Government is more concerned with obtaining superior Soundness of Approach and Management than with making an award at the lowest overall cost to the Government. However, the Government will not make an award at a significantly higher overall cost to the Government to achieve slightly superior Soundness of Approach and Management features.

Although the plaintiff attempts to minimize the [DELETED] difference in proposals between R & D and Cube, the fact remains that R & D was superior in the factor which was weighted the heaviest in the solicitation, Soundness of Approach (weighted 45 percent), and in all three of its subfactors—Procedure/Methods/Schedules for accomplishing Technical Provision requirements, Labor and supervisory man-hours in each Technical Provision, and Equipment utilization by Technical Provision. R & D also was superior in the factor with the second greatest weight, Management (25 percent), and in two of its four subfactors—Organizational chart and Mobilization/startup plan. R & D also was superior in Past Performance (15 percent), and presented lower risk in all factors. Cube was superior to R & D in none of the technical factor and subfactors. Cube's numerical score in the evaluation was [DELETED]; R & D's numerical score, at [DELETED], was [DELETED] percent higher than Cube's. R & D's overwhelming technical superiority was reflected in the Source Selection Authority's conclusion that R & D was "substantially superior" to Cube.

The Source Selection Authority also stated: "I do not feel that [Cube's] technical approach and supporting cost proposal adequately addresses the scope of the solicitation," and lacked cost realism, compared to R

& D's cost proposal. The supporting Source Selection Decision Summary concluded that "[i]t would be extremely difficult for [Cube] to perform the work contained in the proposal at an acceptable level at [Cube's] proposed cost." The government's analysis concluded that Cube's actual costs under the contract would be not the [DELETED] proposed, but [DELETED], which is less than [DELETED] percent below R & D's proposed cost of $14,380,522.00. The Source Selection Authority determined that "[R & D's] offer represents a proposed cost that provides best value to the government when consideration is given to actual costs under current market conditions and technical and functional capabilities of this offeror." With the evaluated costs of the two offerors relatively close, given the size of the contract, R & D's technical superiority, noted above, provides a reasonable basis for a best value award to R & D. As noted above, the evaluation criteria stated that: "[T]he Government is more concerned with obtaining superior Soundness of Approach and Management than with making an award at the lowest overall cost to the Government."

Since the government determined that Cube's proposal was short a total of [DELETED] man-years, Cube calculated the cost of those man-years at [DELETED], a figure less than the [DELETED] the government determined would be Cube's probable cost increase. Cube then argues that, as a result, the difference between the evaluated cost proposals is larger than the [DELETED] percent difference noted above. However, the government's figure of [DELETED] is the evaluated total contract cost increase based on the Government Estimate and historical costs, and not exclusively the man-year shortage.

Finally, plaintiff argues that the government essentially eliminated cost as a factor in the procurement. The cost realism analysis conducted by the government, however, placed the two cost proposals relatively close, given the size of the contract, so that the Source Selection Authority determined the technical advantage possessed by R & D was worth the relatively slightly higher evaluated cost of R & D's proposal compared to Cube's evaluated cost, using the cost realism analysis. In a case in which the awardee's proposal cost 100 percent more than one protester and one-half billion dollars more than the other protester, the United States Court of Appeals for the Federal Circuit stated: "Accordingly, a proposal which is one point better than another but costs millions of dollars more may be selected if the agency can demonstrate within a reasonable certainty that the added value of the proposal is worth the higher price." *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959–60 (Fed.Cir.1993). *See also Widnall v. B3H Corp.,* 75 F.3d 1577, 1581–82, 1584 (Fed.Cir. 1996); *TRW, Inc. v. Widnall,* 98 F.3d 1325, 1327 (Fed.Cir.1996); *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 & n. 3 (Fed.Cir.1996). The court finds that the government's evaluation was not conducted improperly, and that the Source Selection Authority's award decision to R & D Maintenance had a reasonable basis and was neither arbitrary nor capricious.

Since the court finds the government's evaluation to have been reasonable, and not a violation of statute or regulation, we do not reach the issue of whether or not plaintiff was prejudiced by the alleged improper conduct of the government.

*Injunctive Relief*

The request for injunctive relief is based on the plaintiff's allegations of government errors and violations in the solicitation and evaluation of proposals, which were discussed above and found to be without merit. In the consideration of injunctive relief, the Federal Circuit has stated:

> To obtain the extraordinary relief of an injunction prior to trial, the movant carries the burden to establish a right thereto in light of the following factors: 1) that the movant is likely to succeed on the merits at trial; 2) that it will suffer irreparable harm if preliminary relief is not granted; 3) that the balance of the hardships tips in the movant's favor; and 4) that a preliminary injunction will not be contrary to the public interest.

*FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993) (citations omitted). *See also Seattle Sec. Servs., Inc. v. United States,*

2000 WL 132759, at § III (Fed.Cl. Jan. 28, 2000); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 393, 398–99 (1999); *ES–KO, Inc. v. United States,* 44 Fed.Cl. 429, 432–37 (1999). The Federal Circuit in *FMC Corporation* noted that: "Absent a showing that a movant is likely to succeed on the merits, we question whether the movant can ever be entitled to a preliminary injunction unless some extraordinary injury or strong public interest is also shown." *FMC Corp. v. United States,* 3 F.3d at 427. The plaintiff argues that injunctive relief would serve the public interest, in that: "An award that rests on a flawed or arbitrary procurement decision compromises the integrity of the procurement process. The public has a substantial interest in preserving the integrity of that process." The plaintiff, however, does not appear to be arguing that it should receive injunctive relief absent a showing of likelihood of success on the merits. In fact, given the finding by the court that this award by the Corps of ₁Engineers was not flawed, but properly performed under statute and regulation, the public interest would be served by not overturning or recompeting an agency award decision which is neither arbitrary or capricious nor an abuse of agency discretion.

Plaintiff also argues that it will suffer irreparable injury if injunctive relief is not granted. Plaintiff asserts that a proper evaluation would have led to selection of Cube for the award, and that the loss of profit to be made on the contract constitutes irreparable injury. Defendant disputes that loss of a valuable business opportunity constitutes irreparable injury sufficient to support injunctive relief.[3] However, even if purely economic harm were sufficient to constitute irreparable injury, with the court's finding that the agency evaluation was prop-

er, in balancing hardships under the test for injunctive relief, loss of profit on the contract would represent a similar economic hardship for the awardee, R & D. In addition, overturning a proper agency evaluation would consume the time and resources necessary for the government to either transition from R & D to Cube, or recompete the procurement. Under the Federal Circuit's test in *FMC Corporation,* plaintiff has not demonstrated "some extraordinary injury or strong public interest" to justify injunctive relief in spite of plaintiff's failure to succeed on the merits. *FMC Corp. v. United States,* 3 F.3d at 427. Injunctive relief in favor of the plaintiff is unwarranted.

### CONCLUSION

For the foregoing reasons, the plaintiff's motion for permanent injunctive relief is, hereby, **DENIED.** The motions of the defendant and the intervenor for summary judgment on the administrative record, are, hereby, **GRANTED.**

**IT IS SO ORDERED.**

---

**3.** The defendant relies on *United Int'l Investigative Servs. Inc. v. United States,* 42 Fed.Cl. 73, 75 (1998), *aff'd,* 194 F.3d 1335 (1999) (Table) (*reh'g denied*) ("Plaintiff's allegation of harm (that it would suffer an 'unjust loss of a valuable business opportunity with the Government') does not rise to the level of the irreparable harm that must be shown to receive injunctive relief") and *Minor Metals, Inc. v. United States,* 38 Fed.Cl. 379, 381–82 (1997) (both cases citing *Zenith Radio Corp. v. United States,* 710 F.2d 806, 810 (Fed.Cir.1983)). Plaintiff relies on *Informatics Corp. v. United*

*States,* 40 Fed.Cl. 508, 518 (1998) ("Plaintiff has demonstrated that absent injunctive relief it would suffer irreparable harm by the loss of anticipated profits from a contract award."); *Day & Zimmermann Servs. v. United States,* 38 Fed.Cl. 591, 610 (1997); *ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. 489, 505 (1997), *appeal dismissed,* 132 F.3d 49 (Fed.Cir.1997) (Table). *See also Seattle Security Servs., Inc. v. United States,* 2000 WL 132759, at § IIIA & n. 19; *Ellsworth Assocs., Inc. v. United States,* 45 Fed. Cl. at 398.